UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SHAININ II, LLC, et al.,

            Plaintiffs,

v.

JOHN ALLEN, et al.,

            Defendants.

NO. C06-420P

ORDER ON PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

       This matter comes before the Court on Plaintiffs' motion for a preliminary injunction. (Dkt. No. 5). Plaintiffs filed this motion concurrently with their complaint, which raises claims for breach of contract, trademark infringement and unfair competition under the Lanham Act, tortious interference, Washington Consumer Protection Act violations, and misappropriation of trade secrets. After Defendants' counsel appeared in this matter, the Court held a status conference with the parties and set a briefing schedule for the preliminary injunction motion. The Court held a hearing on this matter on May 11, 2006.

       Having reviewed the papers and pleadings submitted by the parties and having considered the evidence and argument presented at the hearing, the Court hereby GRANTS IN PART and DENIES IN PART Plaintiffs' motion for a preliminary injunction. Subject to the more specific limitations discussed in the body of this Order, the Court finds that Plaintiffs are entitled to a preliminary injunction to enjoin Defendants: (1) from performing or rendering services for certain clients for whom

ORDER - 1

they performed services while employed by Plaintiffs; and (2) from including Plaintiffs' trademarks in the metatags for websites operated by Defendants. The Court finds that a preliminary injunction is not warranted with respect to the remainder of the Plaintiffs' claims. This Order is contingent on Plaintiffs' posting of security in the amount of $5,000 no later than 5:00 p.m. on May 17, 2006.

Pursuant to Fed. R. Civ. P. 52(a), the Court's findings of fact and conclusions of law are set forth below.

**Findings of Fact**

1. Plaintiffs are Shainin II, LLC; Shainin LLC; and Red X Holdings LLC, all of which are affiliated Nevada limited liability companies with their principal place of business in Anacortes, Washington. The Court will refer to Plaintiffs collectively as "Shainin." Shainin provides consulting and training services to help manufacturing and product development businesses avoid and reduce costs associated with technical problems.

2. Defendants are John Allen, a resident of New Hampshire; John Allen LLC, a Delaware company; David Hartshorne, a citizen and resident of the United Kingdom; The New Science of Fixing Things, Ltd, a United Kingdom company; and David Hartshorne, Ltd., a United Kingdom company.

3. Mr. Allen previously worked for Shainin as a consultant, an employee, and a member. Mr. Allen resigned from Shainin in the summer of 2004. Mr. Allen now offers consulting and training services through John Allen LLC.

4. Mr. Hartshorne was affiliated with Shainin at various times as a member and as a consultant. He states that he resigned as a member of Shainin in the summer of 2003. Mr. Hartshorne continued to perform some consulting work for the company after resigning as a member. He terminated his consulting agreement with Shainin in December 2005. Mr. Hartshorne now offers consulting and training services through David Hartshorne, Ltd.

5. Mr. Allen and Mr. Hartshorne executed employment agreements while affiliated with Shainin. For example, Mr. Allen executed an Employment Consultant Agreement that became

ORDER - 2

effective on May 5, 2003. This Agreement includes a non-competition clause. At Section 9.4, the Agreement provides:

> Employee . . . agrees that, during the Term of this Agreement and for a period of three (3) years after the termination of this Agreement . . . Employee will not perform or render services for any client of SLLC [Shainin LLC] either as an advisor, employee or consultant, or directly or indirectly participate in any way in the provision or rendering of services for any client of SLLC, whether or not the Shainin System or the Shainin Technology or Red X trademarks are used in connection with such services. For purposes of this Section 9.4, a "client of SLLC" is any person or entity for whom an SLLC consultant, Member or employee, has performed consulting or other services during the three (3) years immediately preceding termination of this Agreement. . . .

(Dkt. 2-1, Ex. C, § 9.4). This Agreement also provides that "[t]he parties acknowledge that the time, scope, geographic area and other provisions of this Section 9 have been specifically negotiated by sophisticated commercial parties and agree that all such provisions are reasonable under the circumstances of the activities contemplated by this Agreement. . . ." (Id. § 9.7).

6.  Mr. Hartshorne also executed an agreement with Shainin that includes a non-competition clause. From the record, it appears that the most recent non-competition agreement applicable to Mr. Hartshorne is a "Standard Consultant Agreement" signed by Mr. Hartshorne on July 8, 1998. (Dkt. 1-2, Ex. 5). This non-competition agreement is largely the same as Mr. Allen's, although it does not include an acknowledgment that the agreement is "reasonable." Mr. Hartshorne alleges that this non-competition agreement will expire in August 2006, a point that Plaintiffs have not disputed.

7.  Plaintiffs maintain that the employment agreements executed by Mr. Allen and Mr. Hartshorne include provisions that bar them from soliciting Shainin's clients. However, Plaintiffs have not cited specific non-solicitation language from either agreement, nor has the Court been able to find express non-solicitation clauses in the agreements.

8.  Shainin provided Mr. Allen and Mr. Hartshorne with lists that included the Shainin's clients to whom their respective non-competition agreements would allegedly apply. See Third Decl. of Shainin, Exs. 16 & 17. The list provided to Mr. Allen included more than 150 clients, while the list

ORDER - 3

provided to Mr. Hartshorne included more than 100 clients. It is not clear from the record what criteria Shainin used to determine whether a company qualified as a "client" for inclusion on these lists.

9. Since ending their affiliations with Shainin, Mr. Allen and Mr. Hartshorne have worked together in connection with a business called "The New Science of Fixing Things, Ltd." According to Mr. Hartshorne, he and his wife are the sole owners of The New Science of Fixing Things Ltd. See Hartshorne Decl. ¶ 1; cf. Allen Decl. ¶ 30 (stating that Mr. Hartshorne is the sole owner of The New Science of Fixing Things). The company is incorporated in the United Kingdom.

10. The website for The New Science of Fixing Things has included, among other things, a description of seminars that the company plans to offer. Plaintiffs have introduced a page from the website that describes the seminars, which states:

> The New Science of Fixing Things now offers a new two-day seminar taught by founders David Hartshorne and John Allen. This fast-paced seminar teaches the lessons they have learned in their careers as professional problem solvers working on planes, trains, and automobiles and everything in between, through a series of cases they will teach with the style and wit they are known for. The seminar will excite engineers and technical people, as well [as] engineering and quality directors as it delves into the principles of good strategy and sound technical models to fix things...fast."

(Dkt. No. 3-2, Ex. E at 6).

11. The New Science of Fixing Things has scheduled a seminar to take place in Michigan on May 17-18, 2006. At the hearing on this matter, Defendants' counsel indicated that the fee for attending the Michigan seminar is $1,250. Plaintiffs' counsel also indicated at the hearing that Shainin conducts seminars that are similar to the type of seminars that Defendants plan to conduct.

12. Mr. Allen acknowledges that he has invited employees of Shainin's clients to attend seminars for The New Science of Fixing Things. Mr. Allen states:

> In March 2006, we posted notice of our initial seminar on the New Science of Fixing Things website. I also invited persons who worked for clients that I had worked with while at Shainin to this public seminar. In my view, inviting these people to a public seminar did not amount to solicitation of work. I could write a book and they could choose to read. I could present the

ORDER - 4

same material orally and pictorially at a seminar. I made very clear to persons who I knew to be Shainin clients that I could not work for them due to my contract with Shainin.

(Allen Decl. ¶ 46).

  13. Both Mr. Allen and Mr. Hartshorne executed various confidentiality or non-disclosure agreements with Shainin. For example, Mr. Allen executed an Employment Consultant Agreement that became effective on May 5, 2003 and which includes the following provision:

> During the Term and thereafter, Employee shall maintain as confidential and shall not use, publish or disclose the Shainin Technology[1] or the Shainin System[2] in any form, except as expressly provided by this Agreement, without the prior written approval of SLLC.

(Dkt. No. 2-1, Ex. C, § 9.1). This Agreement also provides that Mr. Allen shall maintain the confidentiality of "certain business plans, customer lists, and other confidential business information of SLLC, as well as certain confidential information of SLLC's clients." Id. § 9.2. Mr. Hartshorne's confidentiality agreements include similar terms. See, e.g., Dkt. No. 1-2, Ex. 5, §§ 9.1 - 9.3 and 3.7 - 3.8 (1998 Standard Consulting Agreement executed by Mr. Hartshorne).

  14. Plaintiffs maintain that Mr. Allen and Mr. Hartshorne have disclosed or will disclose information that is confidential or proprietary to Shainin, in violation of their confidentiality agreements. Mr. Allen and Mr. Hartshorne sharply dispute that they have disclosed or will disclose

---

[1] "Shainin Technology" is defined in the Agreement as "proprietary techniques, Algorithms (as defined herein), methods, software and copyrighted lecture materials currently used in the U.S. and abroad by Red X and its licensees, including those embodied in the Shainin System (as defined herein)," as well as "all improvements, enhancements and modifications to the Shainin Technology prepared by or for Red X or its licensees, SLLC." Id. § 3.8

[2] The "Shainin System" is defined in the Agreement as "the strategies for, and methods of, statistical engineering, management consulting, statistical analysis, and problem solving, as applied to manufacturing quality control, productivity improvement, defect prevention, product reliability improvement evaluation, product development, product liability improvement and liability prevention, and methods for improving product and process control and research productivity developed or owned by Red X, including those which are currently in use of Red X or have been used in the past by Red X or its predecessors or licensees (including Employee) as part of their consulting operations; and all improvements, enhancements and modifications to the Shainin System made during the term of this Agreement." Id. § 3.7

ORDER - 5

any information that is confidential or proprietary to Shainin. In large part, the testimony and evidence submitted by the parties is diametrically opposed. On the limited record before the Court at time, the Court cannot resolve these factual disputes with any degree of certainty, particularly in light of the highly technical nature of the disputed issues. In particular, the Court finds that Plaintiffs have not demonstrated a probability of success on their claims that Defendants' use of energy function models has violated or is likely to violate their confidentiality agreements with Shainin.[3]

15. David Hartshorne has maintained a website (www.david-hartshorne.com) which discusses his consulting services, as well as the seminars offered through The New Science of Fixing Things. The metatags[4] for this website have included a number of terms that Plaintiffs have registered as trademarks, including but not limited to the terms "SHAININ," "RED X," "GREEN Y," and "FEMCA." (Dkt. No. 3-1, Ex. B). Plaintiffs also claim trademark rights to two other terms ("B VS C" and "COMPONENT SEARCH") that have been included in similar forms in the metatags for Mr. Hartshorne's site, although Plaintiffs have not registered those marks.

**Conclusions of Law**

1. A preliminary injunction is appropriate if: (1) the moving party will suffer irreparable injury if relief is denied; (2) the moving party will likely prevail on the merits at trial; (3) the balance of

---

[3] In connection with this motion, the parties have filed a significant amount of materials under seal. The Court has provisionally granted the parties leave to file these materials under seal. Because this Order will not be under seal, the Court generally errs on the side of caution in this Order in discussing information or materials that one side or the other has deemed confidential. The Court's caution in discussing such materials should not be construed as a determination that these materials are in fact confidential or proprietary.

[4] One court has described metatags as "hidden HTML code intended to describe the contents of the web page. On many search engines, the more often a term appears in the metatags of a particular web page, the more likely it is that the web page will be 'hit' in a search for that keyword and the higher on the list of 'hits' the web page will appear." Interactive Prods. Corp. v. A2Z Mobile Office Solutions, Inc., 326 F.3d 687, 692 (6th Cir. 2003).

ORDER - 6

potential harm favors the moving party; and (4) in certain cases, the public interest favors granting injunctive relief. Textile Unlimited, Inc. v. A..BMH Co., Inc., 240 F.3d 781, 786 (9th Cir. 2001). In seeking a preliminary injunction, a plaintiff meets its burden by demonstrating either: (1) a combination of probable success on the merits and the possibility of irreparable injury; or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. Id. These two formulations are not separate tests but represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. United States v. Odessa Union Warehouse Co-op, 833 F.2d 172, 174 (9th Cir. 1987).

2. Plaintiffs seek a preliminary injunction based on their claims for breach of contract, violations of the Lanham Act, tortious interference, and violations of the Washington Consumer Protection Act. By letter sent to the Court prior to the hearing in this matter, Plaintiffs withdrew the portion of their original preliminary injunction motion that was based on alleged violations of the Uniform Trade Secrets Act, RCW 19.108.010 et seq.

### Breach of Non-Competition Agreements

3. Plaintiffs argue that Defendants have violated or intend to violate their contracts with Shainin by soliciting and providing services to Shainin's clients. Defendants argue that the non-competition agreements are unreasonable in scope and unenforceable.

4. The non-competition agreements at issue in this case are governed by Nevada law. By statute, Nevada expressly permits employers to enforce non-competition agreements, as long as they are reasonable in scope and duration. See Nev. Rev. Stat. § 613.200(4)(a). Defendants do not argue that the duration of the non-competition agreements are unreasonable. Instead, they argue that the agreements are unreasonable in scope.

5. The Nevada Supreme Court has adopted the following test for evaluating the reasonableness of a non-competition agreement:

ORDER - 7

> [T]he test usually stated for determining the validity of the [non-competition] covenant as written is whether it imposes upon the employee any greater restraint than is reasonably necessary to protect the business and good will of the employer. A restraint of trade is unreasonable, in the absence of statutory authorization or dominant social or economic justification, if it is greater than is required for the protection of the person for whose benefit the restraint is imposed or imposes undue hardship upon the person restricted. The period of time during which the restraint is to last and the territory that is included are important factors to be considered in determining the reasonableness of the agreement.

Hansen v. Edwards, 426 P.2d 792, 793 (Nev. 1967).

6. Nevada courts have sometimes limited the scope of non-competition agreements that are unreasonably overbroad, without holding that the agreements are unenforceable in their entirety. See, e.g., Hansen, 426 P.2d at 794; Ellis v. McDaniel, 596 P.2d 222, 224-25 (Nev. 1979). But cf. Jones v. Deeter, 913 P.2d 1272, 1275 (Nev. 1996) (holding that overbroad covenant not to compete was per se unreasonable and therefore unenforceable). In addition, Mr. Allen's agreement expressly provides that if a court finds that the non-competition restrictions in his agreement are unreasonable, "the parties hereto agree that the maximum period or scope reasonable under the circumstances shall be substituted for the stated period or scope, and that such court . . . shall be allowed to revise the restrictions contained herein to cover the maximum period and scope determined by such court to be permitted by law." (Dkt. No. 2-1, Ex. C, § 9.7).

7. The parties agree that there is no Nevada case law on whether a non-competition agreement is reasonable if prohibits an employee from soliciting or performing services for any of the former employer's clients, regardless of geographic location or whether the employee had actually performed services for the client. Defendants note that courts in some jurisdictions have held that such restrictions are overbroad and unenforceable. See, e.g., American Software USA, Inc. v. Moore, 448 S.E.2d 206, 209 (Ga. 1994) ("[A] prohibition against doing business with *any* of an employer's customers, whether or not a relationship existed between the customer and the former employee, is overbroad.") (emphasis in original); Pinnacle Performance, Inc. v. Hessing, 17 P.3d 308, 312 (Idaho Ct. App. 2001) ("[A] prohibition against doing business with an employer's clients, without regard to

ORDER - 8

whether a relationship existed between the client and the employee, is an overbroad means of protecting the employer's interest in the goodwill developed by the employee."). However, Plaintiffs note that courts in other jurisdictions have enforced such limitations. See, e.g., Dam, Snell & Taveirne, Ltd. v. Verchota, 754 N.E.2d 464, 470 (Ill. App. 2001) (enforcing non-competition agreement that barred accountant from providing accounting services to any of former employer's clients, regardless of whether former employee had provided services to such clients during her employment).

8. The Court concludes that Plaintiffs have not shown a probability of success on their claims that the non-competition clauses, as written, are enforceable under Nevada law. There is a lack of Nevada case law considering the enforceability of non-competition clauses that are similar in scope to those presented here. The Court has little basis to find that the Nevada Supreme Court would uphold a non-competition clause that bars an employee from performing services for any of an employer's clients, without regard to geographic location or whether the employee himself had performed services for the client.

9. However, the Court concludes that the Nevada Supreme Court would likely find that the non-competition clauses at issue in this case are reasonable and enforceable to the extent that they preclude Defendants from performing or rendering services for clients for whom they performed services while employed by Shainin. The Court concludes that Nevada courts would likely find that such a restriction reasonably prevents Defendants from using client relationships they built as a result of their employment with Shainin for their own benefit, rather than for Shainin's benefit.

10. Plaintiffs have offered evidence indicating that Defendants are likely to perform or render services to clients for whom they performed services while at Shainin unless a preliminary injunction issues. It is undisputed that Mr. Allen invited persons employed by clients for whom he performed services while at Shainin to attend seminars to be conducted by The New Science of Fixing Things. It is not clear that such solicitations, in and of themselves, violate Mr. Allen's non-

ORDER - 9

competition agreement with Shainin, since the Court has not located language in his agreement that expressly prohibits solicitation of Shainin's clients. However, these solicitations plainly suggest that Mr. Allen and Mr. Hartshorne intend to provide or render services for their former Shainin clients through seminars to be offered by The New Science of Fixing Things.

11. To the extent that Plaintiffs seek to enjoin Defendants from performing or rendering services for Shainin clients for whom Defendants performed services while employed at Shainin, the balance of hardships tips sharply in Plaintiffs' favor. Plaintiffs may lose business opportunities to Defendants unless such conduct is enjoined, while any hardships that Defendants may experience as a result of such a modest restriction would be minimal.

12. To the extent that Plaintiffs seek a broader injunction that would enjoin Defendants from performing or rendering services for any persons or entities who were Shainin clients in the three years preceding the termination of Defendants' respective non-competition agreements, the Court finds that the balance of hardships does not tip sharply in Plaintiffs' favor. While Plaintiffs may lose business opportunities to Defendants as a result of such conduct, Defendants would also experience significant hardships. Shainin seeks to preclude Defendants from performing or rendering services to more than 100 Shainin clients, including a number of large companies in the United States and abroad. Defendants' ability to conduct business would be significantly restricted if they are precluded during the course of this litigation from performing or rendering services to more than 100 companies.

13. To determine the appropriate scope of injunctive relief, the Court must determine the termination dates of Defendants' respective non-competition agreements with Shainin. The record is not entirely clear in this regard. For Mr. Allen, it appears that his agreement was terminated on September 12, 2004. See 3rd Shanin Decl., Ex. 17 (letter to Mr. Allen from Shanin's counsel indicating that his employment agreement would be deemed terminated as of September 12, 2004). As a result, his non-competition agreement would remain in effect until September 12, 2007, to the extent it is enforceable. For Mr. Hartshorne, it appears that his agreement was terminated no later than

ORDER - 10

August 31, 2003, making the non-competition agreement effective until no later than August 31, 2006. See Defs.'s Opp. at 12 (asserting that Mr. Hartshorne's non-competition provision expires in August 2006); Pls.' Amended Proposed Order at ¶ 3 (similar).

14.  As written, the non-competition agreements prohibit Defendants from performing or rendering services for persons or entities who were clients of Shainin for the three years immediately preceding termination of their respective agreements. For the reasons discussed above, the Court finds that a Nevada court would likely find that this provision is enforceable to the extent that it bars Defendants from performing or rendering services to a person or entity for whom Defendants performed services as an employee, consultant, or member of Shainin during the three-year period preceding the termination of their respective employment agreements.

15.  Therefore, Mr. Allen will be enjoined from performing or rendering services for persons or entities for whom he performed services as a Shainin employee, consultant, or member between September 13, 2001 and September 12, 2004. Unless otherwise ordered by the Court, this injunction will remain in effect until September 12, 2007, when Mr. Allen's non-competition provision expires. This restriction will apply to Mr. Allen and to John Allen LLC, as well as to their officers, agents, servants, employees, and other persons acting in concert with them.

16.  Mr. Hartshorne will be enjoined from performing or rendering services for persons or entities for whom he performed services as a Shainin employee, consultant, or member between September 1, 2000 and August 31, 2003. Unless otherwise ordered by the Court, this injunction will remain in effect until August 31, 2006, when Mr. Hartshorne's non-competition provision expires. This restriction will apply to Mr. Hartshorne, David Hartshorne, Ltd., and The New Science of Fixing Things, Ltd., as well as to their officers, agents, servants, employees, and other persons acting in concert with them.

17.  These restrictions do not preclude Defendants from conducting the seminar that The New Science of Fixing Things plans to offer in Michigan on May 17-18, 2006. However, this seminar

ORDER - 11

may not be attended by persons or employees of entities for whom Mr. Allen or Mr. Hartshorne performed services as a Shainin employee, consultant, or member in the three years immediately preceding the termination of their employment agreements. Mr. Allen's non-competition agreements prohibits him from performing or rendering services to Shainin clients "either as an advisor, employee or consultant," while Mr. Hartshorne's non-competition agreement bars him from "directly or indirectly perform[ing] consulting services" for Shainin clients. These restrictions on serving as an advisor or consultant may be read to restrict Mr. Allen and Mr. Hartshorne from teaching seminars that are attended by their former Shainin clients, particularly in light of the fees that are charged to attend the seminars.

18. Defendants will not be enjoined from soliciting or performing services for persons or entities who were not Shainin clients but who are simply part of a Shainin client's supply chain. To the extent that Plaintiffs suggest that such a restriction is warranted by provisions of Defendants' non-competition agreements that bar Defendants from "directly or indirectly" participating in the provision or rendering of services for Shainin clients, the Court concludes that a Nevada court would likely find such restrictions to be overbroad.

Breach of Confidentiality Agreements

19. Plaintiffs also argue that Defendants have violated their confidentiality agreements with Shainin or will violate those agreements unless a preliminary injunction issues. The confidentiality agreements are governed by Nevada law.

20. By statute, Nevada permits employers to require employees to execute and enforce confidentiality agreements. See Nev. Rev. Stat. § 613.200(4)(b) (employers may prohibit an employee from "[d]isclosing any trade secrets, business methods, lists of customers, secret formulas or processes or confidential information learned or obtained during the course of his employment . . ., if the agreement is supported by valuable consideration and is otherwise reasonable in its scope and duration.").

ORDER - 12

21. On the limited record before it, the Court cannot conclude that Plaintiffs have demonstrated a probability of success on their claims that Defendants have violated or will violate the terms of their confidentiality agreements with Shainin. The facts underlying these claims are sharply disputed by the parties and are highly technical. The Court is not able to resolve these factual disputes with any degree of certainty, given the diametrically opposed testimony and evidence offered by the parties and the limited record before the Court. Indeed, this is the type of case in which the Court would be likely to seek appointment of an independent expert pursuant to Fed. R. Evid. 706. As the Ninth Circuit has noted, "[i]n deciding a motion for a preliminary injunction, the district court 'is not bound to decide doubtful and difficult questions of law or disputed questions of fact.'" Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson, 799 F.2d 547, 551 (9th Cir. 1986).

22. Even if the Court were to find that Plaintiffs have raised serious questions going to the merits of their claims that Defendants have violated or will violate the confidentiality provisions of their employment agreements, the balance of hardships does not tip so sharply in Plaintiffs' favor as to warrant a preliminary injunction. Plaintiffs would likely suffer some degree of hardship if Defendants were to disclose Plaintiffs' proprietary or confidential information. However, Defendants would also suffer significant hardships if they were enjoined from conducting seminars or performing consulting services in the manner requested by Plaintiffs. Mr. Allen maintains that he has spent a significant amount of time developing the ideas that he and Mr. Hartshorne intend to present through The New Science of Fixing Things and that they have incurred a significant amount of costs, expenses, and liabilities to develop these ideas, establish a website, and produce seminar materials. (Allen Decl. ¶ 53). Mr. Allen estimates that if he and Mr. Hartshorne are precluded from working and using their methodology, they will incur between $200,000 to $1,000,000 in lost revenue over the next 2 to 12 months. Id. In light of these contentions, the balance of hardships does not tip so sharply in Plaintiffs' favor as to warrant injunctive relief.

ORDER - 13

Trademark Infringement Claims

23.     Plaintiffs also raise claims for trademark infringement. At the hearing on this matter, Plaintiffs' counsel indicated that their request for injunctive relief for trademark infringement is based on the use of Plaintiffs' trademarks in the metatags of Defendants' websites. It is undisputed that a website operated by Defendant David Hartshorne has included Plaintiff's registered trademarks in its metatags, including the trademarks "SHAININ," "RED X," "GREEN Y," and "FEMCA." Mr. Hartshorne's site has also included confusingly similar variations of terms to which Plaintiffs claim trademark rights, including "B VS C" and "COMPONENT SEARCH."

24.     Under Ninth Circuit law, the use of a plaintiff's trademarks in the metatags of a defendant's website may give rise to a claim for trademark infringement. See Brookfield Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1061-65 (9th Cir. 1999). In such cases, the use of another's trademarks in metatags may result in "initial interest confusion" by diverting Internet users to the defendant's website, thereby allowing the defendant to benefit the goodwill the plaintiff has developed in its marks. Id. at 1062. However, it should be noted that the use of another's trademarks in metatags does not automatically result in trademark infringement. For example, the use of trademarks in metatags may be a permissible "nominative use" of the trademark. See, e.g., Playboy Enters., Inc. v. Welles, 279 F.3d 796 (9th Cir. 2002) (holding that use of trademarks for "playboy" and "playmate" in metatags of a model's website constituted nominative use).

25.     At a minimum, the Court concludes that Plaintiffs have raised serious questions going to the merits of their claims of trademark infringement based on Defendant Hartshorne's use of Shainin's trademarks in website's metatags.

26.     The Court also finds that the balance of hardships tips sharply in Plaintiffs' favor with respect to their request for an injunction regarding Defendants' use of Plaintiffs' trademarks in metatags. Defendants would suffer little if any hardship by being restrained from using Plaintiffs' trademarks in metatags during the pendency of this action. Indeed, Defendants' counsel indicated at

ORDER - 14

the hearing that Defendants have already removed the metatags from Mr. Hartshorne's website, suggesting that Defendants will suffer no hardship if they are enjoined from such conduct.

<u>Remaining Claims</u>

27.    Plaintiffs also raise claims for tortious interference, unfair competition, and violations of the Washington Consumer Protection Act. These claims are essentially based on the same factual allegations supporting the claims discussed above, and the parties' briefing on these claims is not extensive. In ruling on the pending motion, the Court finds that it is not necessary to reach these additional claims. Even if the Court were to conclude that Plaintiffs have demonstrated that a preliminary injunction is warranted with respect to these claims, the injunctive relief ordered by the Court would not be materially different than the relief ordered below.

**Injunctive Order**

Consistent with the findings of fact and conclusions of law set forth above, the Court finds that Plaintiffs' motion for a preliminary injunction should be granted in part and denied in part. The Court ORDERS as follows:

During the pendency of this action, Defendants are restrained and enjoined as follows:

1.    Defendants John Allen and John Allen LLC, and each of their officers, agents, servants, employees, and other persons acting in concert with them, are prohibited from performing or rendering services for any person or entity for whom Mr. Allen performed services as an employee, member, and/or consultant of Shainin between September 13, 2001 and September 12, 2004. Unless otherwise ordered by the Court, these restraints will remain in effect until September 12, 2007.

2.    Defendants David Hartshorne, David Hartshorne, Ltd., and The New Science of Fixing Things, Ltd., and each of their officers, agents, servants, employees, and other persons acting in concert with them, are prohibited from performing or rendering services for any person or entity for whom Mr. Hartshorne performed services as an employee, member, and/or consultant of Shainin

ORDER - 15

between September 1, 2000 and August 31, 2003. Unless otherwise ordered by the Court, these restraints will remain in effect until August 31, 2006.

   3.   Defendants shall not include Plaintiffs' trademarks or confusingly similar marks in the metatags for any of their websites, including the marks SHAININ, RED X, GREEN Y, FEMCA, B VS C, or COMPONENT SEARCH.

   4.   This Order shall not be construed as precluding Defendants from conducting the seminar that The New Science of Fixing Things plans to offer in Michigan on May 17-18, 2006. However, this seminar may not be attended by persons or employees of entities for whom Mr. Allen or Mr. Hartshorne performed services as a Shainin employee, consultant, or member in the three years immediately preceding the termination of their respective employment agreements.

   5.   This Order shall not be construed as enjoining Defendants from soliciting or performing services for persons or entities who are not Shainin clients but who are simply in the supply chain of a Shainin client.

Fed. R. Civ. P. 65(c) provides that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." At the hearing on this matter, Defendants' counsel indicated that only a nominal bond would be necessary if the Court were to limit injunctive relief in the manner prescribed in this Order. Therefore, the Court sets security in the amount of $5,000, which Plaintiffs shall post by 5:00 p.m. on Wednesday, May 17, 2006. This Order shall be contingent on the posting of such security.

**Conclusion**

For the reasons discussed above, the Court finds that Plaintiffs are entitled to a preliminary injunction to enjoin Defendants: (1) from performing or rendering services for certain clients for whom they performed services while employed by Plaintiffs; and (2) from including Plaintiffs' trademarks in

ORDER - 16

the metatags for websites operated by Defendants. The Court finds that a preliminary injunction is not warranted with respect to the remainder of the Plaintiffs' claims. This Order is contingent on Plaintiffs' posting of security in the amount of $5,000 no later than 5:00 p.m. on May 17, 2006.

This Order is necessarily based on a limited record and does not serve as a final adjudication of Plaintiffs' claims or a final determination regarding Defendants' obligations under their contracts with Shainin. "[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits," and a court may reach opposite conclusions on a more complete record. University of Texas v. Camenisch, 451 U.S. 390, 395 (1981).

The clerk is directed to send copies of this order to all counsel of record.

Dated: May 15, 2006

                                          s/Marsha J. Pechman
                                          Marsha J. Pechman
                                          United States District Judge

ORDER - 17